1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF NEW YORK

3    WILMINGTON PT CORP,              .    Docket No.
                                      .    1:19-cv-02035-DG-RLM
4         Plaintiff,                  .
                                      .
5            v.                       .    Brooklyn, New York
                                      .    Thursday, January 13, 2022
6    PARVINDER S. TIWANA, et          .    3:00 p.m.
     al.,                             .
7                                     .
          Defendants.                 .
8     .  .  .  .  .  .  .  .  .  .  .  .  .

9

10        TRANSCRIPT OF TELEPHONIC PRE-MOTION CONFERENCE
              BEFORE THE HONORABLE ROANNE L. MANN
                UNITED STATES MAGISTRATE JUDGE
11

     APPEARANCES:
12

     For the Plaintiff:          The Margolin & Weinreb Law Group,
13                                LLP
                                  ALYSSA KAPNER, ESQ.
14                                165 Eileen Way
                                  Suite 101
15                                Syosset, New York 11791
                                  516-945-6055
16

     For the Defendants:         Pitchayan & Associates, P.C.
17                                RASHMI ATTRI, ESQ.
                                  7230 Broadway
18                                3rd Floor
                                  Jackson Heights, New York 11372
19                                718-478-9272

20

21   Transcription Service:      Opti-Script, Inc.
                                  P.O. Box 77
22                                Winfield, PA 17889
                                  800-494-7500
23

24   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.
25

1          P R O C E E D I N G S

2          THE COURT:  This is Judge Mann on the line.  I'm

3  conducting a telephonic pre-motion conference in Wilmington

4  PT Corp versus Tiwana, et al., 19-cv-2035.  We're proceeding

5  remotely because of the pandemic.  I hope everyone is safe

6  and healthy.  Let me begin by taking the roll call in the

7  case.

8          Who is on the line on behalf of the Plaintiff,

9  Wilmington PT Corporation?

10         MS. KAPNER:  Good afternoon, Your Honor.  My name

11 is Alyssa Kapner from the Margolin & Weinreb Law Group, for

12 the Plaintiff, Wilmington PT Corp, and I realize that I am

13 not on the docket, and I will fix that as soon as we get off.

14         THE COURT:  You are not.

15         MS. KAPNER:  Yes, I will take --

16         THE COURT:  Go ahead.

17         MS. KAPNER:  -- care of that.  And a representative

18 for my client is also on the line, his name is Eital Korb.

19         MR. KORB:  Yeah, good afternoon, Your Honor.

20         THE COURT:  Could you please spell your first and

21 last name?

22         MR. KORB:  Yes.  It's Eital, E-I-T-A-L, and last

23 name is Korb, K-O-R-B.

24         THE COURT:  I'm sorry, A as in Apple, O-R-B?

25         MR. KORB:  No.  K.  K.

1          MS. KAPNER:  K, as in kite.

2          THE COURT:  K, Korb, okay.

3          MR. KORB:  Yes.

4          THE COURT:  Thank you.

5          And who is on the line on behalf of Defendants, the

6     Tiwana Defendants?

7          MS. ATTRI:  Good afternoon, Your Honor, this is

8     Rashmi Attri of Pitchayan & Associates, P.C., for the

9     defendants, Parvinder Tiwana and Jasvir Tiwana.  Parvinder

10    Tiwana is present on the line.  Jasvir Tiwana is out of the

11    country, so she is not able to be present for this

12    conference.

13         THE COURT:  I'm sorry, which one of your clients is

14    on the line?

15         MS. ATTRI:  The first one, Your Honor, Parvinder --

16         THE COURT:  Okay.

17         MS. ATTRI:  -- Tiwana.

18         THE COURT:  All right.  Thank you.  This is on for

19    a pre-motion conference is connection with the parties'

20    intentions to renew their motions for summary judgment before

21    the newly assigned district court judge, Judge Gujarati.  She

22    has asked me to conduct this pre-motion conference.  I would

23    not be surprised if the entire motion gets referred to me,

24    although at the present time, I don't know whether that will

25    be before me for report and recommendation or whether she'll

1 be handling the motion -- the cross motions for summary

2 judgment.

3          Before I talk about the contemplated dispositive

4 motions, I'd just like to get a little update, factual

5 update, from the parties.  I take it the Defendants continued

6 to reside outside the premises, is that correct?

7          MS. ATTRI:  Yes, Your Honor.  That is correct, for

8 now.

9          THE COURT:  And they live, if I recall correctly,

10 they live in Florida; is that right?

11          MS. ATTRI:  No, Your Honor, that's Virginia.

12          THE COURT:  And so they're renting out the

13 premises?

14          MS. ATTRI:  Yes, Your Honor.

15          THE COURT:  And I take it there is no dispute that

16 they have failed to -- they've been in default now for is it

17 nine years?

18          MS. ATTRI:  For the second mortgage, the mortgage

19 which is the subject of this foreclosure action, it is maybe

20 Your Honor, since 2000 -- during the economic crash in 2008,

21 I believe.

22          THE COURT:  Now, I have to admit, I was a little

23 confused when I was reviewing the requests for a pre-motion

24 conference.  I was a little confused given the first mortgage

25 and the second mortgage and there's a reference in the

1    sentence to the two mortgages and then saying that mortgage

2    is the subject of this lawsuit.  So do I understand, there's

3    a first mortgage that the Plaintiff has nothing to do with?

4              MS. ATTRI:  You are right, Your Honor.

5              THE COURT:  Okay.  And is that in default?

6              MS. ATTRI:  No, Your Honor.  First mortgage is

7    current.

8              THE COURT:  Okay.  So it's only the second

9    mortgage, that mortgage that is the subject of this

10   litigation is in default and has been in default for over a

11   decade?

12             MS. ATTRI:  Correct, Your Honor.

13             THE COURT:  And is it the -- what is the

14   Plaintiff's -- I'm sorry, the Defendant's position that

15   the -- well, I know there's a standing issue and it seems to

16   be Plaintiff's position that they, you know, they have the

17   note and mortgage, they're in possession of it, so what is

18   the issue with standing?

19             MS. ATTRI:  Your Honor, as you know, a motion for

20   summary judgment was by the Plaintiff filed earlier too, and

21   they included an affidavit from the Plaintiff.  And that

22   affidavit did not give any details as to the possession of

23   Northern Mortgage when it was taken into possession.

24             And during the discovery proceedings, we requested

25   a copy of the original note that we have not seen yet.  And

1   then due to the pandemic also all these things got stayed.

2   So the note and mortgage that was attached with the summons

3   and complaint was a little bit in favor of a nonparty.  Then

4   there are a lot of endorsement which are undated and blank,

5   so that is not sufficient enough for Plaintiffs to say that

6   they have standing to foreclose on this mortgage when

7   Defendant has raised the standing into issue.

8           Now, they have the burden to establish as their

9   prima facie case that they have the standing because they

10  have so many endorsements on this note, and there is no

11  reference to the date, when the note was transferred from one

12  bank to another.  So between the original lender and the

13  current Plaintiff there are, I think, four or five

14  endorsements to different banks of this note.

15          So, it is not clear.  And the affidavit that was

16  included by Plaintiff in their previous motion, that did not

17  give any reference to the personal knowledge of the person

18  who was giving that affidavit in support.  He did not even

19  mention the date or that the Plaintiff is in possession of

20  the note.  So --

21          THE COURT:  Well, I remember -- I think I saw in

22  the record and I can't remember whether it was the original

23  motion, whether it's in Plaintiff's counsel's letter, recent

24  letter, in connection with the pre-motion conference, but

25  it's the Plaintiff's position that the Plaintiff is in

physical possession of the note and mortgage.  And if that's

the case, then whether you have the exact date as to, you

know, when the transfer occurred and even assuming that there

are undated and blank endorsements, what difference does that

make?

MS. ATTRI:  Mere statement by the attorneys that

they are in possession of the note and mortgage is not

sufficient.  That's what I believe, Your Honor, because the

affidavit doesn't -- did mention that -- they give all the

details, and -- but nothing about the possession of the note

and mortgage.  Then Defendant filed a cross-motion and

highlighted that.  And in opposition to Defendant's

cross-motion, then Plaintiff attached another affidavit, like

it looks like they can add anything into that affidavit,

whatever is required to prove standing.  But in the --

THE COURT:  Well, did you ever ask to see, you

know -- you did point out that we're in the midst of a

pandemic.  There have been periods of times between surges

when people have not had to shelter as we are now in the

fourth wave.  Did you ever ask -- you say that it's not

enough to rely on counsel's statement, but you could've asked

to actually see the original document.  Did you ever ask to

see the original document?

MS. ATTRI:  Yes, Your Honor.  In the original

discovery request, we made the request to inspect the

1   original note.

2          THE COURT:  And what was the response to that?

3          MS. ATTRI:  The response was that they will

4   schedule a date for inspection or something like that.

5          THE COURT:  So they said you can come and see it.

6   Did you follow up?

7          MS. ATTRI:  After that, Your Honor, when we were in

8   the motion practice, at that point, I raised that point, too,

9   regarding the inspection.  But what I believe that in one of

10  the conversations during that motion practice, counsel

11  was -- I was dealing with the counsel present in the

12  courtroom today.  They were working remotely.

13         THE COURT:  Well --

14         MS. ATTRI:  All the documents and motion papers

15  also were sent to each other via email.

16         THE COURT:  Well, if they offered to make the

17  original available for inspection, and you never followed up

18  to actually take a look and inspect it, then they're not

19  obligated in connection with either moving for summary

20  judgment or responding to your motion for summary judgment to

21  actually attach the original to hard copy form and deliver

22  them to the Court.

23         If they've made them available for inspection or if

24  they put in sworn statements about -- that they're available,

25  then you don't have any contrary evidence.  You don't have

1   anything to contradict that the Plaintiff is in possession of

2   the original note and mortgage.

3           MS. ATTRI:  They didn't say that it is available.

4   They said that they will make it available -- they will make

5   it available.  It was not that some date was scheduled, or

6   they gave us that on that day you can come to our office, and

7   it is available.  It was not like that, Your Honor.  Most of

8   the stuff we requested in the discovery, that was -- the

9   response was that it is part of the summons and complaint or

10  the Defendant already has it.  As to inspection of what I

11  remember, it was something of that -- so that they will make

12  it available.  Then the matter was stayed, too, during

13  this -- another case which was pending and --

14          THE COURT:   Schiffman.

15          MS. ATTRI:  Yes, yes.

16          THE COURT:  Did someone just join, or did we lose

17  someone?

18          MS. KAPNER:  Yes, Your Honor.  My client got

19  disconnected.  He just, I think, came back in.

20          MR. KORB:  Yes.  Sorry about that.

21          MS. KAPNER:  Yeah.  Okay.

22          THE COURT:  Well, I appreciate the case was stayed

23  for some period of time, but the stay has been lifted.

24          Let me just hear from Ms. Kapner on this particular

25  issue, and then I'll follow up with Defense counsel about the

1  other issues, legal issues, to be addressed.  Ms. Kapner,

2  where is the original note and the mortgage at this time?

3          MS. KAPNER:  So all the original documents are kept

4  securely at our client's custodian's custodian.  So it's not

5  the type of thing that, you know, we just have available at

6  any time, so which is why we stated that we would make it

7  available on a date and time and we would have done so.

8  Obviously, we would have to request it, we would have to sign

9  documents, they would have to be sent to us, it would have to

10  be sent back to them.  So the original document is in

11  physical possession of our client's custodian on behalf of

12  our client.

13          If seeing the original note will, you know, change

14  anything for the Defendants, I don't necessarily know if it

15  will, I understand what you are saying in the sense that

16  assuming that we can prove standing, and if we did show them

17  the original note, then what, what's their next, right?  I'm

18  guessing that's where you were headed.  Because even if,

19  let's just say, in this case, for whatever reason the case

20  gets dismissed because we, you know -- some minor procedural

21  whatever it is, ultimately, we can then bring another

22  foreclosure case and fix whatever.

23          You know, so I don't believe that there are any

24  issues and I believe that we are able to prove our prima

25  facia case in this case, but ultimately when it comes down to

1   it, this is a second mortgage.  They are current on the first

2   mortgage.  They are renting out the property.  And we did go

3   through mediation where we wanted to try to settle this, and

4   we weren't able to.  That was some time ago; it may have been

5   in early 2020 -- end of 2019, I believe.  You know, we would

6   be open to reopening those discussions, if they are

7   interested, but otherwise, you know, I don't -- I'm not

8   really sure what their end goal is at this point.

9           THE COURT:  Well, I said I wanted to limit my

10  discussion with you, at this point, to the standing issue and

11  I think you've answered that.  Just to clarify, to the extent

12  that Ms. Attri wanted to see the original documents, she

13  wouldn't have to go to Plaintiff's custodian's office to see

14  it.  You're saying you could arrange to have it made

15  available at your office?

16          MS. KAPNER:  That's correct.

17          THE COURT:  Ms. Attri, would you like to see the

18  original documents?

19          MS. ATTRI:  Yes, Your Honor.

20          THE COURT:  When would you like to see them?

21          MS. ATTRI:  First, I need to know how much time

22  Plaintiff's counsel needs to -- I can -- whenever, yes, they

23  can make it available, I can schedule an appointment to go to

24  their office and see it there.

25          THE COURT:  Well, let me ask you.  Once you see

1  them, if you see them and there's nothing to suggest that

2  they are inauthentic, will that eliminate the standing issue?

3        MS. ATTRI:  Standing issue, yes, Your Honor.

4        THE COURT:  All right.  So what I'm going to do is

5  before we conclude, I'm going to set a deadline by which the

6  parties should make arrangements to have Ms. Attri -- to have

7  the documents delivered to Plaintiff's counsel so the

8  Defendant's counsel can come at a mutually agreeable time to

9  see the original documents.  And hopefully that will then at

10  least eliminate one of the disputed issues in the case.

11        So now let's talk about the remaining issue or

12  issues.  Ms. Attri?

13        MS. ATTRI:  Yes, Your Honor.  One more thing that I

14  want to -- either we can go to (indiscernible) or 1304

15  notice.

16        THE COURT:  I'm sorry.  I'm sorry.  You broke up.

17  What did you say?

18        MS. ATTRI:  I said that, Your Honor, either we can

19  go into the statute prerequisite for foreclosure action, or

20  there is one more factual detail I want to bring to the

21  Court's attention before that.  This loan was discharged in

22  bankruptcy and with that -- just a second.  It was done in

23  2011.  So, the loan has been discharged, both loans, first

24  and the second loan, which is subject of this foreclosure

25  action.

1       And the first mortgage alone takes up the whole

2   equity and value of the property because the first mortgage,

3   Defendant is current with the first mortgage, which is around

4   $1 million at this time, and he is paying on that mortgage.

5   And the value of the house, we have not done any formal

6   appraisal, but value of the house is also something similar.

7       So my point here is the Plaintiff only has mortgage

8   on the property.  Note is no longer there; it has been

9   discharged.  Even if they get this foreclosure action, like

10  summary judgment in their favor, they are not able to sell

11  this property because the first mortgage holder is still

12  there, and the Defendant is current with them.  So what the

13  second mortgage holder will accomplish by this foreclosure

14  action, that I just want to know, considering there is not

15  much equity left for the Plaintiff.

16      THE COURT:  Well, I want to look up the answer

17  because I was a little surprised to hear you say that the

18  debt was discharged in bankruptcy.  I noted that your letter

19  had a reference to a bankruptcy discharge, but I thought that

20  related to earlier obligations, and so this is very

21  surprising to me.  So I'm just looking up your answer.  Do

22  you raise this as an affirmative defense?

23      MS. ATTRI:  Not as an affirmative defense, Your

24  Honor, but in the -- it was in my request for pre-motion

25  conference.   I need to actually -- I need to go back to the

1  answers.

2          THE COURT:  Yeah.  I'm looking at the answer right

3  now.  I'm up to the ninth affirmative defense, which is the

4  last one, and it wasn't raised as an affirmative defense.

5          Let me hear what Ms. Kapner has to say in response.

6          MS. KAPNER:  Sure, Your Honor.  I am not a

7  bankruptcy expert and so I would need -- but from my

8  understanding, we are fully permitted to seek a judgment of

9  foreclosure and sale on this property.  What we cannot do is

10  subsequently seek a deficiency judgment against the borrowers

11  due to the bankruptcy, which we will not and do not plan to

12  do.

13          In terms of Ms. Attri's question of the value of

14  the property and how much is owed on the first mortgage and

15  there's no equity, et cetera, et cetera and what does my

16  client plan to do with the property, or any second

17  mortgage -- let me know if you want me to go into that or

18  should I just stop at the bankruptcy?

19          THE COURT:  No, no.

20          MS. KAPNER:  Okay.  So --

21          THE COURT:  Let me ask you, were you -- -- you seem

22  to have anticipated this, were -- is it undisputed that the

23  note was discharged in bankruptcy?

24          MS. KAPNER:  No.  I don't want to say that because

25  I don't know the exact terminology.  I did see -- I obviously

1  read defendant's cross letter that she's referring to.  So

2  assuming that that is true, I don't want to say whether it

3  was or wasn't discharged, but I do know that if it was, that

4  we still are able to foreclose and that we cannot seek a

5  deficiency judgment.  So that is all that I can speak to at

6  this time on that.  So I don't believe that it forecloses or

7  prevents us from proceeding as we were planning to proceed.

8         THE COURT:  Well, what would you expect to get out

9  of that?

10         MS. KAPNER:  If we proceeded with a foreclosure

11  sale?

12         THE COURT:  Yes.

13         MS. KAPNER:  So what we have --

14         THE COURT:  I take it you're aware of fact that

15  there's a very substantial first mortgage?

16         MS. KAPNER:  Yes.  So what would happen is we would

17  have a foreclosure sale.  It would either be sold to a third

18  party purchaser who would take the property, subject to the

19  first mortgage and would have to either pay off the first

20  mortgage, come to some sort of deal with them, you know,

21  whatever it is, and would become the owner of the property,

22  and the same would happen if it went back to the Plaintiff,

23  and the plaintiff became the owner.  Whoever purchased it at

24  the foreclosure sale would purchase it subject to the first

25  mortgage.  That's obviously any one's individual or

1  business's business decision to make, if they, you know -- I

2  don't really know what to say in terms of that. If someone

3  thinks that the property is worth it to purchase it with the

4  first mortgage on it, subject to, then that would be their

5  right to do so. There's not really much more explanation to

6  that. My client is --

7          THE COURT: Well, you seem to be suggesting that

8  there would be a purchaser who presumably would purchase it

9  for some amount of money. Let's say the amount of money is

10  the same as the first mortgage --

11          MS. KAPNER: Sorry. I'm going to interrupt you

12  because it would actually be whatever is owed to the second

13  mortgage, to my client, is what the judgment amount would be,

14  so let's just -- I'm just going to throw out a number,

15  $100,000 let's just say is the upset bid at the foreclosure

16  sale. And someone bids $100,001, and becomes -- they will

17  purchase the property for $100,001, subject to the first

18  mortgage, which may be owed according to Defendant's letter,

19  $945,000. So they would have to either come to some sort of

20  agreement with the first mortgage to pay it off, you know,

21  whatever it is, and then they would own the property.

22          THE COURT: So you're saying that the way this

23  would work would be that since you haven't joined whoever

24  holds the first mortgage, if there is a foreclosure, the

25  property would be taken subject to that first mortgage, but

1  the proceeds of the sale, since you're the Plaintiff,

2  would -- even though you hold -- you have a junior lien, the

3  proceeds would come to your client.  And the first mortgage,

4  the property would be taken subject to the first mortgage?

5       MS. KAPNER:  Yes.  So whoever purchased the

6  property would be responsible for the first mortgage.

7       THE COURT:  So you would get paid first then?

8       MS. KAPNER:  Yes, because our loan is in default.

9  So, it's not really a first or second.  If the first mortgage

10 was not current and it was foreclosing, it would name us,

11 since we're subject to it, trying to cut us off, but we can't

12 cut the first off because we're subject to it.  So if the

13 first had a sale and there was, you know, let's say $100,000

14 more in the purchase than it was owed, then my client could

15 potentially try to, you know, go after some of that money.

16 But it doesn't work the reverse way because the first is

17 always going to be ahead of the second.  I'm not sure if I'm

18 explaining that correctly.

19       But, the reason why, in these cases, where there's

20 a second mortgage we try really hard to settle when the first

21 mortgage is current because it's possible, if the foreclosure

22 now comes to fruition, that the borrower is going to lose

23 their property for failure to pay the second mortgage when

24 all this time they're putting money into the property paying

25 the first mortgage.  So it makes sense for everyone to settle

1   it.

2           THE COURT:  All right.  Ms. Attri, so the Defense

3   position is that even assuming that there was a discharge in

4   bankruptcy that nevertheless, the mortgage has not been

5   expunged and that the Plaintiff can still seek foreclosure.

6   I would think that would not be in your clients' interest to

7   allow that to happen?

8           MS. ATTRI:  What I believe, Your Honor, that

9   Plaintiff counsel's approach is very impractical that someone

10  will purchase this property subject to first mortgage and

11  then pay off the second mortgage.  Legally wrong, too,

12  because the first mortgage holder will always have the

13  priority.  They are the first lienholder and they have the

14  first right on the property, and they are current.

15          Yes, at this time, it has not been expunged, but

16  then Defendant always have that option of going back to

17  bankruptcy court and request the Court to expunge the second

18  mortgage, considering there is no equity for the second

19  mortgage.

20          And I just want to add that this bankruptcy

21  discharge has been discussed extensively during the mediation

22  and at the point where Plaintiff filed a notice of appeal to

23  the Circuit Court and the matter was discussed with the judge

24  there before the appeal was perfected, extensively, that

25  there is nothing left for the second mortgage holder.

1          And at that point, actually, Mr. Weinreb, he

2     appeared -- I don't know whether Alyssa was there in the

3     conference or not, and he said that Plaintiff

4     doesn't -- Plaintiff knows that the note will not get

5     anything in here, but they just want to foreclose.  They just

6     want to foreclose on this property.  And they were fully

7     aware at that point, they said that, yes, second mortgage

8     holder will not get anything, it has been discharged.

9          So Plaintiff's counsel has been well aware of this

10    discharge, that this loan has been discharged and they have

11    acknowledged this loan, that there is only a mortgage on the

12    property.  Loan has been discharged long time ago.

13          THE COURT:  All right.  Well, whatever the

14    Plaintiff's motive, if they do -- whether they end up with

15    something or not, it would not be in your client's interest

16    to have this -- have them foreclose on this property.

17          MS. ATTRI:  Yes, Your Honor.  If they still go to

18    get a judgment of foreclosure and try to sell the property

19    and foreclose, that's the only option left with the different

20    entities to expunge this loan, the second mortgage.

21          THE COURT:  Well --

22          MS. ATTRI:  In case they are able to get a

23    judgement of foreclosure instead.

24          THE COURT:  Your clients are living in Virginia; do

25    they have other property in Virginia?

1          MS. ATTRI:  There was a reason actually at this

2    time, Your Honor, when they -- they were living in this

3    property.  It was their primary residence in 2005.  They had

4    to leave that in 2008 when the business closed down.  They

5    lost their job.  So they had to move in Virginia.

6          And now the kids were taking care of the business

7    there.  So they were planning to move actually when this

8    action started.  We've shown that to the Plaintiff's counsel,

9    again, but all this pandemic and that happened.  But that was

10   always the intention of coming back, because they -- a huge

11   down payment was made at the time of this house, like 100,000

12   or something.

13         Then they had to leave; property was occupied by

14   the squatters for 10 years almost.  And they had to fight a

15   long battle in the landlord-tenants court.  They spent money

16   there; applied for loan modification for the first mortgage.

17   So still 2019, they spent a lot of money to bring this

18   mortgage back on track, the first mortgage.  And they started

19   making the payment after going through the landlord-tenant

20   process.  Going through the foreclosure on the first and the

21   loan modification process.

22         And thankfully the first mortgage holder -- they

23   had to actually forgive 400,000 to bring the mortgage equal

24   to the value of the house.  It was, like, 1.4 million because

25   of the seven, eight years default.  So they forgave 400,000

1   principal and brought it equal to the value of the house.

2   And so now they are making mortgage payments for now for

3   three years.

4           So it's not that they just have collecting rent.

5   That's not the case, Your Honor.  The whole scenario can give

6   that impression, that they are living far away in Virginia

7   and just collecting rent, but during the time from 2008 until

8   2018, I think they were not getting anything actually.

9   People were occupying the property and it took a long time to

10  evict them, and then have new tenants who can make the

11  payment and then mortgage can be maintained.

12          THE COURT:  So what are they getting -- what's the

13  amount of rent that they're collecting?

14          MS. ATTRI:  It is actually breaking even at this

15  time, Your Honor.  It is a little -- normally, when the loan

16  modification process was completed, it was like that, but not

17  receiving the complete rent because of the moratorium,

18  hopefully they will be receiving the full rent.  And at the

19  same time, they are intending to come back too.  So they

20  would require -- it is a two-family house, and they would

21  require one unit for themselves, too.

22          THE COURT:  Are they renting out both units?

23          MS. ATTRI:  At this time, yes, the units are rented

24  out.

25          THE COURT:  Both of them?

1          MS. ATTRI:  Yes.  Yes, Your Honor.

2          THE COURT:  And do they own property in Virginia?

3          MS. ATTRI:  Yes, Your Honor.

4          THE COURT:  Are either of them working?

5          MS. ATTRI:  The husband is working.  Wife, she is

6   out of the country at this time.  I do not know.  At one --

7          THE COURT:  Well, I'm prepared to go forward with

8   this pre-motion conference, but it seems to me that it would

9   make sense for the parties to try to resolve this case rather

10  than throwing money to the lawyers to litigate a case that at

11  the end of the day, you know, perhaps it's just a matter of

12  the Defendants continuing to delay the inevitable, and maybe

13  that's fine by them.  But if they really intend to move back

14  to this house, it sounds like there's a good chance that the

15  house is not going to be theirs, even though they have

16  managed to stay current with the -- you know, on their first

17  mortgage.

18          Ms. Kapner, what is the amount allegedly due at

19  this time?

20          MS. KAPNER:  At this time, I cannot answer that

21  because we haven't -- Eital, are you still there?

22          THE CLERK:  Yeah.  I didn't want to interrupt

23  earlier.  I think Mr. Korb dropped off a couple of minutes

24  ago.

25          MS. KAPNER:  Oh, okay.  Okay.  I can give you the

1  amount as of the time we filed the complaint, which was now

2  almost three years ago.  I'm sorry.  I was not expecting to

3  need that information, but -- hold on, having technical

4  difficulties.  As of January 2019, the amount was

5  approximately $259,000.  So the interest obviously has been

6  accruing since then.

7         THE COURT:  And in the course of the mediation or

8  any other settlement discussions, has there been any talk

9  about a loan modification?

10         MS. KAPNER:  Well, that is something that our

11  client did offer and I'm sure would be open to reopening

12  those conversations.  Defendant was, if I recall correctly,

13  not amenable to that.  You know, the interest on the original

14  note I'm looking at right now was 11.75 percent.  So that's

15  the interest rate that it's been accruing at this whole time.

16         I would guess that an interest rate that my client

17  would offer would be less than that for modification, and we

18  can definitely work together to come up with something that's

19  affordable.  Again, I am happy to proceed with the motion

20  practice, but based on what Ms. Attri's saying, it seems that

21  the Defendants want to remain owners of the property, which

22  the only way for them to do so is to settle this case with

23  us.

24         Eventually, the house is going to be foreclosed on

25  if that's not the case, unless, you know, they have some

1    bankruptcy loophole that they want to go through, then I

2    don't -- I think they should spend their time and money on

3    that, if they think they can, you know, wipe out our mortgage

4    completely.  So I'm just a little bit confused as to what the

5    end goal is for the Defendants because I know what our end

6    goal is, is to foreclose or modify, or resolve it in some

7    other way.  So I know we had a --

8         THE COURT:  Well, what kind of -- Ms. Attri

9    suggested that through bankruptcy, if they were to file for

10   bankruptcy yet again and there would not be a prohibition on

11   that, given the length of period that's elapsed since the

12   last one, could they get the mortgage wiped out?

13        MS. ATTRI:  Your Honor, first thing regarding the

14   settlement, yes, we had the discussion regarding the

15   settlement.  I just wanted to address that.

16        As to loan modification, the number that counsel is

17   giving, 11.7 percent interest on the note of 259,000, these

18   are the numbers on the note, but the note has been

19   discharged.  And we are here talking about the mortgage on

20   the property, like what they can recover based on that

21   mortgage.  And mortgage is only up to the value of the

22   property remaining after the first mortgage.

23        So we cannot stick to those 11.7 interest rate on

24   the note, which is no longer in existence, that we have to

25   keep in mind has been discharged.  And as the counsel said,

1  they are not planning to get the money on the note which has

2  been discharged according to the bankruptcy law.

3          Secondly, at that point, when there was actually

4  negative equity, we did try to offer -- at that point,

5  Defendant had the money to offer, I cannot say for now,

6  $8,000 as a lump sum payment to resolve this.  Because as

7  Plaintiff counsel just said that if they foreclose, whatever

8  they can get after paying the first mortgage, that's what

9  they are entitled to.

10          So based on that mortgage, we offered $8,000 lump

11  sum amount, which was three years ago, to resolve this matter

12  for everything.  If we go into loan modification, they are

13  already paying $7,000 on the first mortgage and then on top,

14  they have to pay $500 or $1,000 with that kind of interest

15  rate or maybe lesser than that is not affordable to the

16  Defendant.

17          Secondly, as to the bankruptcy --

18          THE COURT:  Ms. Attri, I had ask Ms. Kapner a

19  question and I didn't get an answer because you just cut off

20  my question and hopped right in there.  Before I put that

21  question again to Ms. Kapner and then I'll hear again from

22  you, I just want to respond to the argument that because the

23  note has been discharged, it's not a modification of a

24  discharged note.  And I take your point on that; however, it

25  would -- so it wouldn't be a loan modification.  It basically

1  would be a discussion to see whether the parties can agree on

2  entirely new terms.

3         So but let me turn back to Ms. Kapner now.  I

4  wanted to hear your response to Ms. Attri's suggestion that

5  through a new bankruptcy the mortgage could be wiped out.  Is

6  that accurate?

7         MS. KAPNER:  Again, I'm not a bankruptcy expert.  I

8  believe that there are certain motions that a borrower or a

9  creditor -- debtor, I'm sorry, can file in bankruptcy court.

10  We would obviously oppose that.  I don't know.  But if they

11  think that they are able to do that -- I would do that if I

12  thought that I could.

13         If I represented the borrowers, I -- we will oppose

14  whatever motions are brought, we will file motions to lift

15  the stay.  You know, since the debtor is really in the

16  position of, you know, doing what they want or need to do in

17  the bankruptcy, we would just go off of whatever they file.

18  So it's not definite that if they file whatever motion in

19  bankruptcy court that they would be able to wipe us out, but

20  they can certainly attempt to.  So I'm not, you

21  know -- that's the best answer I can give.

22         THE COURT:  Okay.  Ms. Attri, I think before I

23  interjected that I wanted to get an answer from Ms. Kapner, I

24  think you were about to say something about a bankruptcy

25  proceeding?

1          MS. ATTRI:  Yes, Your Honor.  I was saying that as

2     to bankruptcy proceedings, Defendants will file a Chapter 13,

3     try to reorganize -- actually, reaffirm the first mortgage

4     and try to expunge the second mortgage, considering there is

5     no value to the -- for the equity available for the second

6     mortgage.

7          As Ms. Kapner also said that the Court will decide

8     or how they're going to oppose, that's something I can't

9     comment at this point, but yes, that can be another recourse

10    for the Defendant if the Plaintiff is just adamant to

11    foreclose and even if they are not getting anything, they

12    just want to take it from the borrower, from the Defendant.

13         MS. KAPNER:  I'm sorry.  I really don't know how

14    to -- that's not really an accurate, you know, portrayal of

15    the situation, but I would -- I don't know what -- where

16    they're at, at this point, if they are going to file

17    bankruptcy.  And they obviously have a right to do so.  If

18    Your Honor, if we -- you think it would be helpful for us to

19    have a settlement conference before Your Honor, we would

20    certainly be amenable to that, otherwise we are happy to

21    proceed with the summary judgment for --

22         THE COURT:  Well, I don't know that a settlement

23    conference beyond -- I mean, I took this opportunity while I

24    had the parties together and I hope Mr. Korb has dialed back

25    in, but I don't believe I've heard -- I mean, Ms. Kapner, if

1  you could shoot him an email or text and ask him to dial back

2  in.

3          But I don't know.  You know, I've tried to explore

4  with the parties the possibility of getting this case

5  resolved.  This is the kind of case that is not going to be

6  resolved unless both sides are really open to it, and that

7  would mean for the Defendants to provide financial

8  information, which would not be part of discovery in this

9  case.  But if they'd be willing to provide financial

10 information for settlement, you know, with the understanding

11 that that's for settlement purposes only, then maybe that

12 would open up a dialogue about either entering into a new

13 loan.  Or if they're unwilling to do it, then the Plaintiff

14 could determine whether the Plaintiff is prepared to accept a

15 modest amount to resolve this case because the Defendants

16 don't have a lot of money.  And at the end of the day, either

17 the Plaintiff prevails, then it's going to be very costly to

18 get to that point.  And at the end of the day, it's not going

19 to be cost effective.

20          Mr. Korb, did you dial back in?

21          MR. KORB:  Yes, because I lost connection again,

22 I'm sorry.

23          THE COURT:  Okay.  Thank you for dialing back in.

24 In any event, I was just encouraging the parties to try to

25 reopen a dialogue about settling this case.  Ms. Kapner had

1    indicated that she would be -- that the Plaintiff would be

2    prepared to participate in the settlement conference, and I

3    was saying -- and she can explain to you what I

4    described -- that at this point I think it's really up to the

5    parties, initially, to have a dialogue and for the Defendants

6    voluntarily to produce financial information for settlement

7    purposes only.

8           But I'm going to assume that the case isn't going

9    to settle and therefore I'd like to proceed further with the,

10   you know, the pre-motion conference.  We've addressed the

11   issue of standing, which may be eliminated if the Plaintiff

12   makes available for inspection the original note and

13   mortgage.  I guess at this point the note is irrelevant if in

14   fact it's been discharged, but the parties should probably

15   explore that as well.  And why don't we talk about the other

16   issues that the Defendants are raising in defense of the

17   foreclosure.

18          Ms. Attri?

19          MS. ATTRI:  Yes, Your Honor.  The second

20   affirmative defense was -- I don't not know the number, but

21   yes, another basis for our motion to dismiss is RPAPL 1304, a

22   condition precedent for any foreclosure action plaintiff has

23   not complied with.  Plaintiff has provided a copy of some

24   receipts, but these receipts are not stamped.  And if you go

25   by the tracking number, nothing shows up.  And in the prior

1  motion, plaintiff filed an affidavit with a different

2  tracking number, with the different -- it was all

3  disorganized to prove that the 1304 notice was sent.

4          And another way to prove was to give the office

5  practice of mailing.  So plaintiff did provide their practice

6  of mailing these 1304 notices, but the affidavit didn't say

7  whether that practice was followed in this case to the full

8  extent.  It doesn't give any detail as to those return

9  receipt, like whether they received it, when did -- actually,

10 there is no proof that it was received by the Plaintiff or it

11 was put in the mail.  That is all part of the affidavit.

12 Plaintiff's own affidavit, that they have not given -- they

13 have not proved that in this particular case, 1304 notice was

14 made according to their office practice, explaining that

15 affidavit.

16         THE COURT:  Well, are you suggesting that what's

17 required is an affidavit from someone saying, in this

18 particular case, I recalled that I followed the office

19 practice?

20         MS. ATTRI:  In this particular case, yes, Your

21 Honor.  The person who gave the affidavit, she said that she

22 has personal knowledge, and she gave the tracking number, the

23 mailing done by certified mail, but the copy of the envelope

24 attached had different tracking number and the affidavit was

25 saying a different tracking number.  So there were

31

1   inconsistencies in the tracking number provided as a copy of

2   the envelope and the tracking number given in her affidavit.

3           THE COURT:  And then there was a revised affidavit

4   signed thereafter that said there were three digits that were

5   off out of multiple digits and there was an error.  So there

6   was a subsequent affidavit filed.

7           MS. ATTRI:  Yes.  After it was pointed out, then

8   she said that, yes.  So how can we believe that it was her

9   personal knowledge, the person who mailed it, giving a

10  different tracking number?  Another thing is, the office

11  practice, Your Honor, that after it was mailed, it is put in

12  the -- they have some mailbox taken by USPS, and then they

13  receive the return receipt and it is put into the system with

14  that client's copy.  Nothing of that sort explained regarding

15  this particular case.  They give a general practice, but no

16  proof that the same practice was followed in this case, too,

17  the later portion.

18          THE COURT:  Well, doesn't Schiffman say that proof

19  of mailing, the proof of the particular practices is

20  sufficient, that you're not -- the likelihood that someone is

21  going to have an independent recollection of what they did

22  years earlier, it's not required.  You're saying you

23  want -- there was sworn statement about the office practices,

24  but there wasn't a sworn statement that in this particular

25  case, I remember that I followed the practices and posted and

1    how I posted these particular notices.  That's not required

2    by the New York Court of Appeals in Schiffman.

3            MS. ATTRI:  Your Honor, they gave the recollection

4    of this case, too.  First, they explained the general office

5    practice, and then they gave the recollection of this

6    particular case, but they went to a certain extent and then

7    they left it there.  So Plaintiff themselves started

8    explaining that how this case also followed the same office

9    practice, but then in the end, they did not show how this

10   case also followed the same office practice.

11           THE COURT:  Well, let me ask you this; assuming

12   that with the inconsistencies, you have called into question

13   whether or not notice was sufficient, what is the upshot of

14   that?  You seem to suggest that you would be entitled to

15   summary judgment dismissing the complaint, but wouldn't that

16   simply lead to a conclusion by the Court that there are

17   material issues of fact?  We need to hear from the affiant

18   for the Plaintiff and from the Defendant regarding whether or

19   not this notice was properly made and whether or not it was

20   received.  Isn't that the ramification, even if you succeed,

21   even if it could be said?

22           And I'm looking at the Schiffman case.  The New

23   York Court of Appeals said to rebut the -- they talked about

24   the nature or extent or departure from stated office routine

25   necessary to rebut the presumption that the practice was

1    followed, and they said that there must be proof of a

2    material deviation from an aspect of the office procedure

3    that would call into doubt whether the notice was properly

4    mailed impacting likelihood of delivery to the intended

5    recipient.  To put it another way, the crux to the inquiry is

6    whether the evidence of the defect can cast doubts on the

7    reliability of the key aspect of the process, such that the

8    inference that the notice was properly prepared and mailed is

9    significantly undermined.  Minor deviations of little

10   consequence or insufficient.

11          So isn't that suggesting that if you call into

12   question the presumption, if you undermine it, then doesn't

13   it become a question of fact for the fact finder to determine

14   after hearing from the parties?

15          MS. ATTRI:  It is actually, Your Honor, the -- this

16   is the prerequisite for any foreclosure action.  And there

17   are cases recently -- I understand what you are saying,

18   summary judgment requires that there is no triable issue of

19   fact.  But there are cases were the courts have dismissed the

20   case just because the condition has not been complied with by

21   the plaintiff.

22          THE COURT:  Well, I don't know.  I'm sure there are

23   cases in which the evidence is patently deficient, but here

24   you have, as you put it, inconsistent information.  You're

25   saying that that's fatally defective, but doesn't it then

1    become a question as to whether the revised affidavit cures

2    that and whether or not the fact finder can rely on the

3    explanation that I made a scrivener's error in the first

4    affidavit?

5            MS. ATTRI:  But at the same time, Your Honor, there

6    is an affidavit from the Defendant, too, that they did not

7    receive it.  We were going into the details of whatever is

8    required to prove the 13, because there is a presumption they

9    have provided those receipts, though unstamped.  But at the

10   same time, there is an affidavit from the Defendants, too,

11   they did not receive 1304 notice.

12           THE COURT:  Well, I know the notices are in the

13   record.  I don't have them in front of me at the present

14   time.  Were those mailed to the property itself?

15           MS. KAPNER:  Yes, they were, Judge.

16           THE COURT:  And remind me, Ms. Kapner, when were

17   the notices mailed?

18           MS. KAPNER:  They were mailed on or about January

19   2nd, 2019.

20           THE COURT:  So in other words, when the Defendants

21   were residing in Virginia?

22           MS. ATTRI:  Yes, Your Honor, but the Court --

23           MS. KAPNER:  I don't know.

24           MS. ATTRI:  Okay.  I want --

25           THE COURT:  Ms. Attri --

1    MS. ATTRI:  Yes.  Yes, Your Honor, but they do go

2  to the property at least once in a month to collect their

3  mail and for the maintenance purposes.  I do not know now at

4  this time how frequently they go to the property, but they

5  used to go to the property once in a month or sometimes two

6  times in a month because at that time, that was the time when

7  they were trying to get rid of those squatters and trying to

8  maintain the property back and applying for loan

9  modification.  All that process was going on.

10    MS. KAPNER:  Your Honor --

11    THE COURT:  Ms. Attri, did the Defendants advise

12  the plaintiff that they weren't residing at the property?

13    MS. ATTRI:  At what --

14    THE COURT:  Ms. Attri?

15    MS. ATTRI:  Yes, Your Honor, I'm here.  You are

16  saying, Your Honor, during this foreclosure process?

17    THE COURT:  Before January 2nd of 2019, you said

18  they were engaging -- prior to that time, they were engaged

19  in negotiations?

20    MS. ATTRI:  I'm not sure, Your Honor.  They were

21  receiving the notices at their Virginia property, too, but I

22  believe this foreclosure action, 1304 notices, and the copy

23  attached with the summons had the subject property address,.

24  And for the first mortgage, I'm sure they were receiving

25  notices at the Virginia address.  I'm not sure about this one

1 because this mortgage was dormant, Your Honor, since 2008.

2 There was not a single notice until 2019 when Plaintiff

3 started this action.

4         So I don't believe they were receiving any notice

5 or anything.  They came to know about this -- they were aware

6 of the second mortgage, but nothing was happening, it was

7 completely inactive.  And in 2019, the summons and complaint

8 came into picture.  So I don't believe there was any

9 correspondence.  I do not know, Your Honor, actually.  I do

10 not know what should I answer here, but there was no

11 correspondence, according to my knowledge, between the

12 Defendant and the Plaintiff, as there were many transfers

13 too.  So there was no correspondence with the Plaintiff, for

14 sure.

15         THE COURT:  Just so I understand it, until this

16 lawsuit was filed, your clients, Ms. Attri, just thought that

17 there was -- you described the second mortgage as dormant,

18 there had been no discussions with Plaintiff?

19         MS. ATTRI:  Correct, Your Honor.

20         THE COURT:  Ms. Kapner, is that accurate?

21         MS. KAPNER:  I don't know if there were any

22 communications prior to 2019 with my client or any

23 predecessors.

24         MS. ATTRI:  I just want to give one

25 actually -- maybe that can help or that can give that answer.

1  Defendant has not been paying the second mortgage and the

2  first mortgage since 2008 or '07 when they defaulted.  And so

3  but the summons and complaint has a default date of 2013 to

4  bring it within the six-year statute of limitations.  But

5  before 2013, too, Defendants were not paying.  And so there

6  was no correspondence regarding second mortgage.  Like it was

7  kind of when Defendants came to our office with the summons

8  and complaint, they were not even -- they forgot completely

9  and then this summons and complaint came.  And then they

10  realized that, oh, there was a second mortgage, but there was

11  not at all any payment or any notices since 2008.  That's why

12  when we saw the summons and complaint, it has the default

13  date 2013, but before that, too, they were not paying.

14       THE COURT:  All right.  Ms. Kapner, is there

15  anything you want to say in response to the argument about

16  the adequacy of notice?

17       MS. KAPNER:  Just that we believe that the notices

18  have been adequately sent and we will provide evidence of

19  that in our forthcoming motion, should our request be

20  granted.

21       THE COURT:  Well, I'll ask you the same question I

22  asked Ms. Attri; isn't there a factual dispute here, and

23  given the inconsistencies -- I appreciate that if you put

24  that evidence in, it may be sufficient to defeat the

25  Defendant's motion for summary judgment, but are you

1  suggesting that the Plaintiffs would be entitled to summary

2  judgment?

3          MS. KAPNER:  Your Honor, I mean, I see that we're

4  sort of arguing the prior motion that was filed, but I

5  believe that that motion is no -- is a moot motion, so we'll

6  be submitting all new documentation.

7          THE COURT:  You might well, but Ms. Attri, in

8  response to your motion or in reply to your opposition, will

9  put in the prior affidavit and say that this affiant is

10 giving inconsistent information.

11         MS. KAPNER:  If that is found by the Court, if the

12 Court agrees with her, then I do believe that would be a

13 triable issue of fact.  That, you know --

14         THE COURT:  Well, what about the fact that not only

15 has the affiant given inconsistent information, but the

16 Defendants deny receipt and they haven't been living at that

17 property for some time so that there is at least -- it's not

18 a situation where someone lives at the property and just

19 says, I never got it delivered, but someone hasn't been

20 residing there and there have been no discussions among the

21 parties before, you know, it was sent to a property that they

22 had vacated years earlier?

23         MS. KAPNER:  Yes.  So --

24         THE COURT:  Doesn't that create a factual dispute?

25         MS. KAPNER:  Well, in terms of receiving the

1   notices, that's not required.  All that's required is proof

2   of mailing of the notices, so that's on that point.

3           THE COURT:  It's not necessary, but that doesn't

4   mean that there isn't a factual issue under the

5   circumstances.

6           MS. KAPNER:  That may be the case.  I believe that

7   according to the relevant law, that whether or not they

8   received it is not relevant to whether it was properly mailed

9   and whether or not 1304 was complied with properly.

10          THE COURT:  Well, again, I don't know that it's

11  fair to say it's irrelevant because there are enough issues

12  that have been raised about whether the mailing was

13  sufficient, coupled with the denial of receipt.  So it's not

14  irrelevant.

15          MS. KAPNER:  Okay.  And in terms of the -- where

16  they were living at the time, unless the Defendants provided

17  proof of their change of address, then there's no way for us

18  or a predecessor to be aware that they no longer lived there.

19  In addition, Defendant's attorney just admitted that they

20  were getting their mail at the property on a regular basis.

21          THE COURT:  But they say they didn't get this

22  notice.  But I agree with you that if they didn't provide the

23  address, the Plaintiff wouldn't have known where to reach

24  them, but isn't that in part a function of the fact that

25  neither Plaintiff nor its predecessor -- that nothing had

1    been done, that they were in default from 2008.  They hear

2    nothing from the mortgage holder and the first thing they

3    find out is they're served with process in -- what year was

4    this?  This was 2019 when they had been in default in 2008.

5    So what would be their reason to provide your client -- they

6    may not have even known that your client acquired the

7    mortgage.  Why would they notify Plaintiff where they were

8    living?

9             MS. KAPNER:  Well, I don't know -- I don't want to

10   agree with the fact that there was no communication from any

11   of my client's predecessors because I am not aware if that is

12   true or not.  Also, we know that they filed bankruptcy in

13   2011, which is after the date that they say they defaulted,

14   and they obviously listed the second mortgage.  So, you know,

15   the fact that they're saying we borrowed

16   $100-something-thousand and we just forgot that that existed

17   and that's their defense, basically, is a little bit, you

18   know, ludicrous, I think.

19            I think that we, if Your Honor agrees, should

20   proceed with the motion practice, and, you know, if

21   Defendants have evidence to prove that they received

22   communication, didn't receive communication, then we

23   would -- you know, that would obviously come into play to

24   determine whether or not these letters should have been sent

25   to another address, but I don't believe that was raised in

1  their answer or in their prior motion.

2      THE COURT:  I don't think they raised it to say

3  that therefore the mailing was improper because it was to the

4  wrong address.  I was just suggesting that that is an

5  explanation.  Well, the lack of -- I take it you don't know

6  one way or the other -- let me withdraw that.

7      Was there any communication between Plaintiff and

8  Defendants before this notice was sent out in 2019?

9      MS. KAPNER:  I do not know.

10      THE COURT:  Mr. Korb, do you know?

11      MR. KORB:  I'm going to say we (indiscernible)

12  service through SCI and they usually send a hello letter, you

13  know, when the loan is bought with them.  And I'm pretty sure

14  that the previous owner of the note had this with SCI.  So

15  usually SCI sends a notice and statement and so the borrower

16  should have received the statement and the hello letter from

17  SCI.  I'm going to check because I might have a copy of it --

18      THE COURT:  Well, I'm curious.  You talked about

19  monthly statements, but my understanding, which I didn't know

20  until this hearing, there are -- the debt was -- the note

21  itself was wiped out, so there's -- although there is a

22  mortgage, there is not a note.  So what monthly statement

23  would there be?  Maybe there is, but I'm trying to educate

24  myself on what happens when the note is extinguished but not

25  the mortgage.

1    MS. KAPNER:  Your Honor --

2    MR. KORB:  Go ahead.

3    THE COURT:  Ms. Kapner?

4    MS. KAPNER:  Yes, no.  I just wanted to clarify,

5  because I couldn't really hear Eital.  It was a little, like,

6  fuzzy.  So what I think he was saying was that usually when

7  notes are sold and purchased, there's what's called a goodbye

8  letter and a hello letter sent to the borrower, which

9  basically says hi, like, either we're no longer servicing

10  your loan as of this date and then another letter that would

11  say, hello, we're your new servicer, we will be servicing

12  your loan as of this date.

13    Is that what you were talking about, Eital?

14    MR. KORB:  Yes.  Correct.  So I'm just looking, and

15  the hello letter was sent by SCI in 2018.

16    MS. KAPNER:  Okay.  So basically a letter from the

17  servicer of the Plaintiff was sent to the borrowers saying we

18  are now the new servicer of your loan, et cetera, et cetera.

19  So that would've been their indication or notice that the

20  loan -- you know, this is who you should reach out to

21  regarding this loan.

22    THE COURT:  Well, the question, the follow-up

23  question I was asking and -- was there is no loan, though?

24  The note has been extinguished.  So I was asking Mr. Korb

25  whether if there's no longer a note, is there still a hello

1  letter and goodbye letter.  And he just indicated there was

2  one sent by the predecessor in 2018 and I was surprised to

3  hear that.

4          Ms. Kapner, what is --

5          MS. KAPNER:  Your Honor, I want to be completely

6  honest.  Regarding that note being discharged, all the

7  bankruptcy stuff, I really don't know enough at this time to,

8  you know, confirm that it was discharged, that there is no

9  longer a note, that, you know, all this stuff that we're

10  talking about.  I don't want to, you know, state that that is

11  the case because I really need to do some more research, talk

12  to our bankruptcy counsel.  So I would rather not speak to

13  that this point.

14          THE COURT:  And Ms. Attri, your client is on the

15  line.  Did your client get a goodbye letter or a hello

16  letter?

17          MS. ATTRI:  Not specifically this letter, but I

18  asked him if there was any correspondence from the bank.  He

19  was not aware of -- maybe he can go into his -- because that

20  was a long time ago.  He can go into the -- in his paperwork

21  and check, but -- do you want me to ask him, Your Honor?

22  I --

23          THE COURT:  Well, why don't we do this?  I mean, I

24  think we should wrap this up now.  We've been having these

25  discussions for an hour and a half now, but I hope that

1  everyone who has been participating realizes that there are a

2  lot of questions and a lot of work that still has to be done.

3  I mean, Ms. Kapner said that she needs to do some research,

4  talk with the bankruptcy attorney.  I mean, this is a case in

5  which discovery concluded quite a while ago.

6        There was a motion for summary judgment and yet

7  there are all these questions that no one is able to respond

8  to.  And yes, if the parties want to confer and reopen

9  discovery, but does it really make sense, or should you be

10 focusing your efforts on trying to get this case resolved?

11        I think what it makes sense to do at this time and

12 I'll throw this proposal out and then if you disagree with

13 me, you know, I'll reconsider, but I think I should give the

14 parties a month to confer with one another further to do

15 whatever research you need to do.  And if you're unable to

16 resolve the case or make progress on a resolution, then you

17 can jointly propose a briefing schedule.

18        I don't know whether you want to have a

19 simultaneous exchange of motions for summary judgment or

20 whether it makes more sense to have one party go first.  And

21 if you need to have, you know, four rounds rather than the

22 usual three so that the one party would be the movant, the

23 other party would be the opponent and cross-movant.  And so

24 you'd have a reply to the original motion and then a reply to

25 the cross-motion.  So that's what I would propose we do now.

1          Ms. Kapner, do you have another suggestion?

2          MS. KAPNER:  I think that's a good idea, Your

3  Honor.

4          THE COURT:  And Ms. Attri?

5          MS. ATTRI:  I agree.

6          THE COURT:  All right.  Is a month sufficient?

7          MS. ATTRI:  Yes, Your Honor.

8          MS. KAPNER:  Yes, I think that's fine.

9          THE COURT:  All right.  So, today is January 13th.

10  February 13th is a Sunday, so by February 14th, you should

11  file a joint letter docketed as a motion event.  And if

12  you've reached an agreement in principle, tell me that and

13  ask that scheduling be held in abeyance.  If you have not

14  reached an agreement and, you know, rather than -- you can

15  also request additional time.  Alternatively, you can

16  propose, jointly propose a briefing schedule on motions for

17  summary judgment.

18          All right.  Anything else before I conclude this

19  proceeding?

20          MS. KAPNER:  Your Honor, I just have a question;

21  when we file the letter as a motion event, what event should

22  we file it under?  The letter event?

23          THE COURT:  I will defer to my law clerk.  I think

24  you can just do motion miscellaneous, but he's more of an

25  expert on that.  Mr. Proujansky?

1        THE CLERK:  If you were looking -- if it's to let

2    the Court know that you've reached a settlement and probably

3    a motion to adjourn, but if it was for a motion to set a

4    briefing schedule, there may be, like, a motion to set a

5    schedule.  I'm not sure.

6        THE COURT:  We can look into that --

7        MS. KAPNER:  Okay.

8        THE COURT:  -- and let you know.  All right.

9    Anything from Ms. Attri?

10       MS. ATTRI:  Nothing further, Your Honor.

11       THE COURT:  All right.  In that case, I'm going to

12   conclude this proceeding.  Happy New Year to everyone.  lease

13   take care and stay safe.  Goodbye.

14       MS. ATTRI:  Thank you.  Thank you.

15       (Proceedings adjourned at 4:30 pm)

16

17                  TRANSCRIBER'S CERTIFICATE

18       I certify that the foregoing is a correct

19   transcript from the electronic sound recording of the

20   proceedings in the above-entitled matter.

21

22   ___*Victoria Applegarth*_____        April 8, 2022
     Victoria Applegarth, CER-1481        _____
                                          DATE
23

     Legal Transcriber
24

25